Vollmer v. State.

CHARLES. VOLLMER, PLAINTIFF IN ERROR, V. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

1. **Murder:** MALICE: PRESUMPTION. On a trial for murder in the second degree, malice can be implied only in cases where the killing alone is shown. Where, in such a trial, the evidence showed all the circumstances connected with the killing by the testimony of the eye-witness, it was held to be error for the court to instruct the jury that, where the fact of killing was established, without any excuse or explanatory circumstances, malice was presumed and the crime would be murder in the second degree.

2. ———: SELF-DEFENSE. An instruction that, "no person has the right to take the life of another, on the grounds of self-defense unless, First, the life of such person is in danger, or such person is in danger of suffering great and permanent bodily injury; Second, If such person's life or body is in danger as last above stated, yet there is a reasonable means of escape from the assault, then it is the duty of such person to escape and save the life of his adversary." *Held*, Error, because it omitted the element of reasonable grounds for the belief of such danger.

3. ———: MALICE. Approximately, malice is that condition of the mind which shows a heart regardless of social duty, and fatally bent on mischief, the existence of which condition is inferred from acts done or words spoken. See *Harris v. State*, 8 Texas App., 91, cited in *Carr v. State*, 23 Neb., 749.

4. ———: EVIDENCE: QUESTION FOR JURY. Where, in a prosecution for murder in the second degree there was some evidence which, if believed by the jury, would tend to show that the ac-

cused was guilty of manslaughter, it was held error for the court to instruct the jury that, if they should find from the evidence that the accused did not kill the deceased maliciously and purposely, they should acquit. It was the province of the jury to pass upon the whole case and say whether the accused, if guilty, was guilty of murder in the second degree or of manslaughter.

ERROR to the district court for Douglas county. Tried below before GROFF, J.

*Lee S. Estelle (Offutt & English* with him), for plaintiff in error, cited: *York's Case,* 9 Met., 91. Wharton Crim. Ev., Sec. 738. *McElvoy v. State,* 9 Neb., 164. 1 Kentucky Law Journal, 162. *State v. McDonell,* 32 Vt., 538. *Carr v. State,* 23 Neb., 749

*William Leese, Attorney General,* and *E. W. Simeral* for the state, cited: *Schlencker v. State,* 9 Neb., 248. *Simmerman v. State,* 14 Id., 568. *State v. Townsend,* 66 Iowa, 741. *Preuit v. People,* 5 Neb., 384. *DeArman v. State,* 71 Ala., 351.

REESE, CH. J.

On the 10th day of June, 1887, an information was filed in the district court of Douglas county, charging plaintiff in error with the crime of murder in the second degree. The trial resulted in a verdict finding him guilty of murder in the second degree, as charged in the information. A motion for a new trial was filed, which was subsequently overruled by the district court, and plaintiff was sentenced to the penitentiary for the term of twenty years. He brings the cause to this court by proceedings in error.

The principal errors assigned in plaintiff's brief relate to the instructions given by the court to the trial jury; and in order to a clear understanding of these instructions, and their applicability to the evidence adduced upon the

trial, it is necessary that a statement of facts as developed, should be here made.    We will therefore give a very brief epitome of what seems to have been the leading and principal facts in the case.

The homicide occurred about eleven o'clock in the afternoon, on Sunday, the 15th day of May, 1887.    It appears that a number of persons assembled at what is known as Moeller's Hall, about seven or eight o'clock in the evening for the purpose of drinking beer, dancing, and the enjoyment of such other social recreation as was suited to the tastes of the persons who assembled there.    Among this assembly were plaintiff in error and the deceased, both of whom were young men.    It is not shown that either of them engaged in the dance, but it very clearly appears that plaintiff in error, and perhaps deceased, drank of the beer which was being sold at the bar in the hall. Deceased had a light rattan cane.    A few words of an unpleasant character were passed between them, when the deceased made some remark, the exact nature of which it is hard to give, as the witnesses differ as to the language used, but it was perhaps in the following language: "What will you take for a pipe full of your mustache?" when plaintiff in error replied in substance, that if deceased would step out plaintiff in error would give him all of the whiskers he wanted.    Deceased then threw down or dropped his cane, and expressed his willingness to step out at once.    At this time some of the persons present interfered and requested that no further difficulty be had.    One of these persons was the daughter of the proprietor of the dance hall, who stepped between the parties and requested or ordered that the quarrel cease.    Plaintiff in error was with a companion by the name of Schell, and possibly others.    Deceased was with a number of friends, whose names we need not here repeat.    One of deceased's friends took him by the arm and led him away.    Soon afterwards plaintiff in error and his friend left the hall, for the pur-

pose of going to a billiard hall and saloon which was perhaps about one block distant. The night was dark, and there was no light upon the streets except such as shone out from the lamps in the saloons and other buildings along the street. On their way down, plaintiff in error and his friend became separated, plaintiff in error being some little distance in advance. Soon after they left the hall, deceased and his friends left and followed after plaintiff in error and his friend, overtaking them a little before they arrived at the saloon to which they were going. It is not shown that plaintiff in error was aware of the approach of deceased and his friends, nor does it appear that deceased and his friends knew they were following plaintiff in error, yet as to the latter there is perhaps some doubt. In passing down the street, deceased was in advance of his friends, and as he passed Schell he struck or tapped him with his cane.

No words seem to have been spoken. Deceased passed on, when Schell was approached by one of deceased's friends, who struck him with his fist in the face. There is some doubt as to whether he was struck by deceased first, or whether he was first struck by deceased's friend, Hinchey, who struck him with his fist. Nothing was said between Hinchey and Schell, but Schell passed on toward where plaintiff in error was. About this time they had approached near to and in front of the billiard hall and saloon to which plaintiff in error was going, and within a few feet of plaintiff in error. It is probable that deceased, being in front of his friend Hinchey, passed Schell, then when Hinchey came up to where Schell was, Hinchey and deceased both moving much faster than Schell, Schell turned around toward Hinchey, when Hinchey struck him in the face. Schell then ran or walked rapidly, overtaking deceased and passing him, when deceased also struck him with his cane. About that time Schell made some outcry, the exact nature of which it is difficult to give, as

the testimony upon that part is conflicting. Some say that he called to plaintiff in error for help; others saying that his remark was, "Give it to them." Plaintiff in error was either standing in front of the saloon to which they were going, or was overtaken at that point, when he fired his pistol, the ball striking deceased and killing him instantly. The crowd immediately scattered, when plaintiff in error went away.

A number of instructions were given to the jury by the trial court, a few of which we will notice. The fourth instruction is as follows:

"You are instructed that where the fact of the killing is established without any excuse or explanatory circumstances, malice is presumed, and the crime would be, under such circumstances, murder in the second degree."

This instruction is objected to as not being applicable to the case made, and as being prejudicial, and as tending to direct the attention of the jury to that particular quality of homicide. This instruction is perhaps based upon *Preuit v. People*, 5 Neb., 377. *Milton v. State*, 6 Id., 136.

The doctrine contained in the instructions, when applied to a case in which nothing further than the killing is shown, is recognized by this court in the case cited, and in some others, but we think it can have no application to cases like the one at bar. All the circumstances of the killing are shown by those who were eye-witnesses. The difficulty which arose in the dance hall was so near the killing, both in point of time and distance, as to enter into the transaction and became a part of the *res gestæ*. There was no time from the utterance of the first unfriendly word, in that hall, until deceased fell lifeless upon the ground, but that a number of witnesses were present, and in company with deceased, as well as plaintiff in error. Every movement and every word which was made or uttered, during the whole transaction, was in the presence of the witnesses who testified upon the trial, and

was detailed by them. Plaintiff in error was indicted for murder in the second degree. It was for the jury to say, from all the circumstances of the case, whether the killing was murder in the second degree, manslaughter, or excusable. When all the facts and circumstances connected with the killing were presented to the jury, it was for them to say whether plaintiff in error purposely and maliciously killed the deceased, or whether the killing was unlawful, without malice, upon sudden quarrel, or unintentionally done (as testified to by plaintiff in error, upon the stand), while the slayer was in the commission of some unlawful act, which would be manslaughter, or whether in self-defense under a reasonable apprehension of danger to life, or great bodily harm, which would be excusable. We therefore think the instruction referred to should not have been given, and that it tended to withdraw from the jury the questions referred to, and which it was their province to decide.

In support of the principle that malice cannot be implied where all the circumstances of the killing are before the jury, but that it must be found by them as any other fact, we note the following cases: *Farris v. Commonwealth,* 14 Bush (Ky.), 363. *Buckner v. Com.,* Id., 601. *Com. v. York,* 9 Met. (Mass.), 93. *Bush v. Com.,* 78 Ky., 268. *State v. Coleman,* 3 Am. Cr. Rep., 180. *Erwin v. The State,* 29 Ohio State, 186.

Complaint is made of the sixth instruction to the jury, which we here copy in connection with the seventh:

"*Sixth.* No person has the right to take the life of another on the ground of self-defense, unless—First, The life of such person is in danger, or such person is in danger of suffering great and permanent bodily injury; and second, If such person's life or body is in danger, as last above stated, yet if there is a reasonable means of escape from the assault, then it is the duty of such person to escape and save the life of his adversary.

"*Seventh.* I therefore charge you that, if you find from the evidence that the defendant, Vollmer, had reasonable cause to believe, at the time the shot was fired which killed Dennis Quinlan, that his life, or the life of his friend Schell, was in danger, or that he or Schell was in danger of great bodily harm, about to be inflicted by the deceased, Quinlan, or his associates, and that they had no reasonable chance to escape, you should acquit the defendant."

It is, perhaps, true that the seventh instruction properly states the law of self-defense to be applied to the case on trial. At least we will so far assume this to be the case as to refrain from any discussion of it, or of the propositions presented by it. But assuming this to be true, it is contended with considerable earnestness by counsel for plaintiff in error that this instruction, if correct, could not be held to modify or explain the sixth instruction, which, it is contended, is manifestly wrong, for the reason that it assumes to state the whole law of self-defense in the abstract, and fails to include therein the elements of reasonable ground on the part of plaintiff in error for his belief or fear of impending danger. While it is true that the giving of a correct instruction cannot cure the error of giving an incorrect one, yet it is possible that the sixth and seventh instructions, when taken together, might not be deemed such prejudicial error as to require the reversal of the judgment, yet we do not think the giving of the sixth can be approved, even if taken in connection with the seventh, and that it should have contained the elements referred to.

The fifth instruction was as follows: "Malice is further defined to be the committing of an unlawful act, intentionally, without just cause or excuse."

This instruction was examined in *Carr v. State*, 23 Neb., 749, not reported at the time this trial was had, and we will therefore refrain from discussing it, further than to say that we can see no reason why the conclusion reached in that case was not the correct one.

Complaint is made of the ninth instruction. It is as follows:

"If you should find from the evidence that the defendant, Vollmer, did not shoot the deceased, Dennis Quinlan, maliciously and purposely, then you should acquit the defendant."

As we have already said, it was for the jury to ascertain the degree of plaintiff's guilt, in case they found him guilty, and that if they found from the evidence that he was guilty of manslaughter, they might so return by their verdict.

Section 489 of the criminal code provides that, in all trials for murder, the jury before whom such trial is had, if they find the accused guilty, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter.

In this case it was the duty of the jury to ascertain whether plaintiff was guilty or not, and if guilty, whether the crime was murder in the second degree or manslaughter.

Cases often arise where it is not proper for the court to submit to the jury the question of the guilt of the accused of any degree of crime less than the one charged. If there is nothing in the evidence tending to show that the crime committed was anything less than the one charged, or the case is presented upon some other issue, as that of the identity of the person charged, the court would be justified in giving an instruction similar to the one here quoted.

The state called as a witness the man Schell, who testified in substance that he and plaintiff in error left the dance hall referred to to go to Jones' saloon; that he, Schell, looked back and saw four or five persons (among them the deceased) pursuing them; that they came up, and as stated by the witness, "one of them hit me square in my face here; another one jumped against me, and hit me here (indicating), and then I turned and ran and felt a clap on my shoulder."

Q.  What did you say?

A.  I says, "Charley, help me," in German.

Q.  What then—what did Charley do?

A.  Well then, as soon as I holler, I hear the shot, because there was some fellers around him, four or five around him.

Q.  Did you see them around him?

A.  Yes, sir.

Q.  How many?

A.  Four or five.

Q.  Who were they?

A.  I don't know; it was pretty dark; I couldn't remember them fellows.

Q.  You saw four or five fellows around you, too?

A.  Yes, sir.

Q.  Was that before the shooting?

A.  Yes, sir.

Q.  Was it after the shooting?

A.  It was before the shooting I seen them fellers jump after me, because as soon as I got something on my face them other fellows ran past me to him.

Plaintiff in error also took the witness stand in his own behalf, and testified that as he approached Jones' saloon, and when in the middle of the street, he heard persons running toward them from the direction of Moeller's Hall, but did not look back; that he heard Schell call for help, when he turned around, and those in pursuit came up to him, when one of them struck him on the head with his fist; that there were about five in number, and when he was struck he heard some one say, "Give it to him," when he shot, for the purpose only of intimidating them, and ran away.

Now, while it was the province of the jury to disbelieve the testimony of plaintiff in error, we are unable to find anything in the case which seems to indicate that he sought this last contest.

Suppose it should be true that he and his companion were set upon by those with whom they had had a dispute in the dance hall, and in the sudden quarrel, and without malice, he had shot deceased, it would, perhaps, have been manslaughter. While we do not presume for a moment to pass upon this question, or the probabilities as to the truthfulness of the statements made, these facts ·called for the submission of the whole case to the jury, in order that they might ascertain the degree of plaintiff's guilt.

In *Beaudieu v. State*, 8 Ohio State, 638, the supreme court of Ohio have said : "However clear and full the proof of guilt may be, the court cannot, under this statute (section 489 of the criminal code, above referred to), determine the degree of crime, except upon conviction by ·confession, in open court, and then only as a question of fact, by the examination of witnesses. But where, as in this case, there is no confession of guilt in open court, but ·all the allegations of the indictment are traversed by the plea of not guilty, the question of the prisoner's guilt and the degree of the crime can, by no state of the evidence, be withdrawn from the consideration of the jury and transferred to the court for decision."

It was there held, as it is by all other courts acting under statutes similar to our own, that in cases where the question of the degree of guilt can arise under the evidence, the court must, under proper instructions, leave it to the jury to fix the degree. See also *State v. Vinsant*, 49 Iowa, 241. *Baker v. People*, 50 Mich., 411. *Lane v. The Commonwealth*, 59 Pa., 371. *Robbins v. State*, 8 Ohio State, 192.

The learned judge before whom the case was tried appears to have been quite careful upon the trial to see that plaintiff in error should have a fair trial, and that all his rights should be protected. But we think that in the hurry of preparing the instructions, which are quite nu-

merous, he inadvertently fell into the errors contained in the instructions above quoted, and for which a new trial must be given.

The judgment of the district court is therefore reversed, and the cause remanded for further proceedings according to law.

REVERSED AND REMANDED.

THE other judges concur.